943 A.2d 1

James Desmond JONES

v.

STATE of Maryland.

No. 875, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Feb. 28, 2008.

George E. Burns, Jr. (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Brian S. Kleinbord (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Argued before SALMON, JAMES R., EYLER, and WOODWARD, JJ.

JAMES R. EYLER, J.,

James Desmond Jones, appellant, was convicted, after a bench trial in the Circuit Court for Anne Arundel County, of second-degree murder and the use of a handgun in the commission of a crime of violence. Subsequently, appellant

was sentenced to twenty-five years imprisonment on the second-degree murder conviction, with twenty-years concurrent on the use of a handgun conviction. On appeal, appellant contends that the trial court erred in denying his motion to suppress and the evidence was insufficient to support his convictions. We shall affirm.

### Factual Background

Prior to trial, a motions hearing was held. The parties stipulated that the court would consider the testimony adduced at the hearing as evidence during trial. At the motions hearing, the following transpired, pertinent to this appeal.

Detective John Lee, of the Annapolis City Police Department, testified that on January 25, 2006, he became involved with the investigation into the homicide of Darnell Brown, who had been killed on January 13, 2006, and whose body had been found on the grounds of St. John's College in Annapolis. Mr. Brown "was known to [the police] to be a seller of [controlled dangerous substances]," and was found dead with several gunshot wounds to the torso, "laying on his side, coat pulled over his head. His pocket [ ] turned inside out. There was drugs found on him. There was a cell phone case . . . but no cell phone." Detectives also found "a series of tire tracks," in "close proximity to where Mr. Brown was found."

Detective Lee testified that Detective Johns obtained Mr. Brown's cell phone records, which revealed a "series of calls made to Mr. Brown just moments before he died. . . ." The calls were traced to "somebody named Jones in Kent County . . . on Station Road." Pursuant to this information, Detective Lee, as well as Detective White, Detective Johns, and Lieutenant Kneisling, of the Annapolis City Police Department, and Deputy Hickman, of the Kent County Sheriff's Department, traveled to 11299 Station Road, the home of appellant and his wife, Tammy Jones.

Detective Lee testified that the property had a long driveway that split to the left and to the right. He stated that initially the officers went "to the left where [they] met an

older couple, the Webs,[1] who said they were Tammy's parents. Ms. Webb said that she was the mother of Tammy Jones and that Tammy Jones lived next door." Ms. Webb, who was "very friendly," and "more than helpful," also told the police that "she thought there was something strange going on over there and that they were into drugs. And that they keep the windows pulled down in the house. And that her daughter was a nice daughter, but she met her husband and has not been right since she met that man." Detective Lee stated that "there's lots and lots of dogs on the property. And they were all making all kinds of noise when we got there." He did not remember whether Ms. Webb "stepped out [of the house] or whether we had to knock briefly and she came out. But we didn't wait at any great length of time at the door."

Detective Lee testified that Detective Johns asked Ms. Webb if she knew her daughter's telephone number. Ms. Webb provided "what she knew to be Tammy Jones' phone number," which was "the same number the [the police] had from the phone records." After speaking with Ms. Webb, who had not indicated that she did not want the officers on the property, the officers "walked over to—the other side of the property," where there were three buildings, one of which, "immediately to the right from the driveway," appeared to be a residence, and two appeared to be "outbuildings or barns." Detective Lee testified that Detective Johns knocked on the front door for several minutes without any answer "when the door opened and a lady who was later identified as Tammy Jones came out of the house and shut the door behind her." Detective Johns testified that it was cold and windy outside, and the officers asked if there was "some place we could go and talk and [Ms. Jones] suggested next door, the building immediately adjacent to her house." The officers followed Ms. Jones to the next building, and "[s]he opened the door and said come on in." Detective Lee stated that Ms. Jones was "very friendly and willing to talk" to the officers.

---

1. The correct spelling is "Webb."

After approximately ten minutes, Detective Lee left the building for a few minutes, leaving Ms. Jones and Detective Johns behind. He was then "summoned to another storage building which was the next barn down." Detective Lee testified that he "was told that Ms. Jones had gone back to her house and retrieved . . . the key to the second barn. . . ." The officers proceeded to the second barn, and Ms. Jones "let them in" and showed them a tan Chevy Malibu. Detective Lee stated that Detective Johns asked if the officers could look inside the car, and Ms. Jones left to retrieve the keys to the car. Detective Lee testified that Ms. Jones returned with the keys "and opened it for Detective Johns," but later stated that he did not recall who opened the car. The police looked inside the vehicle and noticed "some sort of a stain, probably blood in the back seat" that "looked as though it had been cleaned up. And there was also a hole which appeared to possibly be a bullet hole in the back seat of the car."

After observing the interior of the car, Detective Lee photographed the car, the interior of the barn, and the inside of the car. The officers had the car towed to the Annapolis police station as possible evidence, and subsequently applied for a search and seizure warrant for the vehicle.

On cross-examination, Detective Lee testified that he did not recall seeing any "No Trespassing" signs "anywhere on either property."

Detective William Johns testified that, upon arriving at the property, the detectives encountered Ms. Webb, who told them that Tammy Jones was her daughter "and that she lived next door, actually on the same property, but just the house next door to hers." Ms. Webb, who was "very friendly, very cooperative," also told them that "she thought there was something funny going on over there. She thought they were selling drugs or doing drugs over there." Ms. Webb also told the officers that she had rented a car for Ms. Jones to use, and that the rental company wanted the car back, but that Ms. Jones "wouldn't give it back and locked it in one of the shed buildings over there." Ms. Webb asked the officers if they

could try to get the car back for her when they went to speak to Ms. Jones.

While the officers were talking to Ms. Webb, Tammy Jones walked out of the back door, and Ms. Webb "pointed her out to [the officers] and said there's Tammy right there." Subsequently, the officers walked over to the house and knocked on the door for "at least five minutes before it was finally answered . . . . by Tammy Jones." Detective Johns asked Ms. Jones if they could step inside to talk, as it was "a rather cold day," but Ms. Jones said that she would rather they talk in one of the other buildings on the property. Detective Johns stated that "at one point [he] asked her about the car her mother had mentioned. And she stated to [him] that it was in the other shop next door. And [he] asked her if [they] could go over and look at it. She said yes, but she had to go get the key." Subsequently, Ms. Jones went back to the house, and then came out with the key "and opened up the second shop and let [the officers] in."

After Ms. Jones let the officers in to the building, they were able to observe a Chevy Malibu. Detective Johns asked Ms. Jones "if she would mind us looking inside the car and she said no, it was okay, but she had to go get the key." Ms. Jones left again, and returned with the key, which she handed to Detective Johns. Upon opening the car, the officers observed "what appeared to be stains on the back seat that appeared to . . . be blood stains that someone had tried to clean up that were faded." There was also "spots of what appeared to be blood around the doorframe," and a "small hole in the seat back of the back seat on the passenger side, which was consistent . . . with the injuries to the victim."

Detective Johns testified that Ms. Jones confirmed that her mother had rented the car for her to use, and that she was the only one who drove it. Ms. Jones told the officers that she had once allowed her husband, appellant, to drive the car, but that her mother "fussed at her about that, so she never let him drive it again."

Detective Johns testified that he did not recall seeing any "No Trespassing" signs on the property.

Subsequently, Detective Johns was recalled, and shown several photographs, offered into evidence as appellant's Exhibit B, depicting multiple "No Trespassing" signs on the property. Detective Johns identified the areas depicted in the photographs, but testified that the "No Trespassing" signs in the photographs were not there at any time when he was on the property.

The State also offered photographs, admitted as Exhibit 5, depicting photographs taken by police during the execution of the search warrant on February 3, 2006. Detective Johns testified that the photographs did not depict "No Trespassing" signs.

During argument on the suppression motion, appellant argued that the property was "replete" with "No Trespassing" signs; thus, "[a]n intrusion was made onto the property by the police in an unlawful manner. They were essentially trespassers when they crossed over onto this land." In accordance with this argument, appellant requested that the court "suppress the ultimate search of the vehicle ... and everything that flowed from it," as the fruits of an illegal search. Appellant conceded that he did "not have case law that is going to support this type of position, but ... there is plenty of case law that deals with curtilage and the entry onto one's immediate surroundings of their home in an unwelcome and intruding type fashion."

In denying appellant's motion to suppress, the court ruled as follows, in relevant

So I would find as a fact the evidence persuades me that the only sign that was there when the police came to the property was this large sign on the—what appears to be a large cedar tree that according to the testimony was set back 30 feet from the driveway, from the gravel driveway.

And that that sign, which in the photos that we have is shaded by overhanging branches, was a sign which might

have been overlooked by someone coming up the driveway in a normal fashion.

But even if it had not been overlooked what the sign says is "No Trespassing, hunting, or fishing" all of those in larger letters. And in smaller letters "Violators prosecuted under penalty of law."

The inclusion of the words "hunting or fishing" and the fact that the sign is placed back from the road in the middle of a field is significant to the [c]ourt as to the expectations of the owners of the property and the significance they intended that sign to have.

The [c]ourt, like counsel in the case, has done a little research looking for Maryland case law about "No Trespassing" signs and about warrantless entry by police onto property.

And as best I can find we don't really have a case on point where there was a "No Trespassing" sign, which was seen by the police or should have been seen by the police where the police proceeded onto the property and then a court decided, you know, what the significance of the "No Trespassing" sign was as to the warrantless entry.

\* \* \*

And I think under all the circumstances that it was not a violation of the reasonable expectation of privacy for them to come up the driveway in the first place and to go knock on the first door that they came to.

And once they had done that, being in a place where they had the right to be, I think that they had an increased right to stay on the property when Ms. Web, one of the owners of the property, invited them to go and talk to her daughter and didn't tell them to go away.

She was in effect inviting them to stay and to pursue their inquiry. They went and knocked on the door of Ms. Jones. And I do not find that it was unreasonable for them to continue knocking for some minutes until the door was answered because . . . . [i]t could be any explanation for her taking several minutes.

\* \* \*

Again, I don't think it was unreasonable under the circumstances that have been described. And what has been described is that when Ms. Jones did answer the door, she then also was friendly, like her mother, and also was cooperative.

\* \* \*

Because the testimony we have heard was that again [Ms. Jones] is the co-owner of the whole property. . . .

\* \* \*

And [the co-owner of property] ha[s] the right to consent to bring a police officer in the house and let the police officer look around in this room or that room or this shed or that barn. And that is exactly what happened here.

So I think that the evidence is very clear that it had become a consent search. And once they were invited with consent into the sheds and saw the rental car, I think [it] is clear enough under the Carroll doctrine . . . that in order to preserve the evidence that they would have the right to tow it, and to preserve it, and get a search warrant before going further if there were containers within the vehicle that might not be accessible.

And they got that search warrant, so there is not a question once they saw the car the rest of it flows from the facts that we have heard, that the police did only what they had a right to do.

\* \* \*

. . . . And the [c]ourt would deny the motion to suppress under all the circumstances.

Following the denial of appellant's motion to suppress, trial commenced. The following was adduced, pertinent to this appeal.

Ms. Webb testified that she rented a car for Ms. Jones in December, 2005, and that only Ms. Jones was authorized to drive it. Ms. Webb stated that she had seen Ms. Jones driving the car, that she was the principal driver, and that Ms.

Jones drove without appellant in the car on "very few" occasions. Ms. Webb saw appellant driving the car once, and confronted Ms. Jones about it because appellant was not an insured driver on the car. Ms. Webb stated that her daughter was left-handed.

Monica Brown, the decedent's wife, testified that on January 13, 2006, she left $300 in cash for the victim so that he could pay the electric bill. Ms. Brown never saw the money again, and no money was found on the deceased.

Rachel Cline testified as an expert in DNA forensic analysis. Ms. Cline testified that appellant could not be excluded as a "minor contributor" to the DNA evidence obtained from the victim's right front pants pocket. Ms. Jones was excluded as a contributor. Ms. Cline concluded that the bloodstains found on the vehicle's seat cushions matched Mr. Brown's DNA.

Gregory Klees testified as an expert in the field of shooting trajectory analysis. Mr. Klees testified that based on the trajectory of a bullet hole found in the backseat of the Chevy Malibu, the bullet was fired from inside the vehicle, originating towards the passenger's side. Mr. Klees could not state conclusively, however, whether the bullet was fired from the passenger's seat or the driver's seat, agreeing that the shot could possibly have originated from a person firing a weapon with his or her left hand from the driver's side of the vehicle. Photographs of reenactments that were performed "to try to see the possibility or plausibility of [the gun] being fired from various locations" were entered into evidence. Mr. Klees agreed that a photograph of a reenactor shooting from the driver's seat depicted the reenactor "turned around and up on one knee." Mr. Klees stated that during "reenactment of the body positions on the driver's seat, we had the reenactor assume various positions, trying to get the barrel of the firearm in line with the ... developed trajectory line. And that was one position we did to achieve that goal." Photographs were also introduced depicting reenactments of a shooter on the passenger's side.

Mr. Brown died of two gunshot wounds to the chest. A bullet and a spent bullet were recovered from the victim's body, and determined to be .45 caliber. Testimony was adduced that in executing the search warrant, police found several boxes of .45 caliber ammunition at appellant's residence, as well as various weapons. No .45 caliber weapon was found.

In closing arguments, appellant's counsel argued that "the facts that could demonstrate or implicate [appellant's] guilt beyond a reasonable doubt to a moral certainty are forever in juxtapose in this case. I think both the State and this side of the table have combined to show that, if anything, that Tammy Jones was the perpetrator of this particular shooting." Appellant argued that the State had not established that appellant was in the vehicle at the time the shots were fired, and that even if appellant was in the vehicle, there was no proof that he was in the front passenger seat. Appellant also argued that even if he were in the front passenger seat, it was more plausible that the shots came from the driver's side of the vehicle.

The State argued that whether appellant shot the victim, he "was there." The State opined that "after [appellant] and Tammy engaged in the murder of Darnell Brown, [appellant] went through [Mr. Brown's] pockets. And [appellant] took that money. If [appellant] was there when this happened, there is no way that he didn't at least know what went on." "And if [appellant] was in that car, as his DNA shows, when Darnell Brown was murdered, if [appellant] was at the scene and in Darnell Brown's pants pockets at the time he was murdered, then it is certainly fair to say that [appellant] knew what was going on .... [and] was involved."

The court, in convicting appellant of second-degree murder, ruled as follows, in relevant part.

The suggestion was made, I think in a speculative way ... that perhaps [appellant] arrived [at the murder scene] at a later time in a second vehicle, put his hand in the pocket and wasn't even there when the crime took place. Howev-

er, the [c]ourt really has no evidence that the Joneses had two vehicles or that there were multiple vehicles involved.

\* \* \*

And it seems to me that the what happened part of it is answered in large part by the trajectory analysis that was offered by Mr. Klees. . . .

\* \* \*

We have a series of photos. . . . The one line of those reenactment photos is showing the position that a person might have needed to be in to fire the bullet from a handgun in the trajectory of someone in the driver's seat, or coming from the driver's seat.

\* \* \*

The suggestion . . . is that it makes more sense for the driver to have been the shooter, if she were left-handed and basically just whipped around and shot with the gun in her dominant left hand. The picture, however, which matches up with the trajectory of the bullet, does not have the person who would be coming from the driver's seat, however, in what to me would be a natural position.

The person, a woman . . . basically has to get up on her knees in order to have the gun that high. The position of the gun is almost basically to the top of the headrest. So that for someone to shoot the gun in that way, the person in the driver's seat would have to raise their hand as high as their head, turn around and shoot.

\* \* \*

The evidence and line of photos from the reenactor on the passenger's side is that that person . . . would be able to fire from what looks to me to be a more natural position.

\* \* \*

So all of that to me, again, is consistent with shots being fired from the passenger's side of the car.

\* \* \*

[T]he only evidence we have as to usage of the car was that most of the time [appellant and Ms. Jones] were in it

together, and all but one time he was the passenger and she was the driver.

So in effect I find that that is unrebutted evidence of a habit or routine. Even though it's a habit or routine which is only a month in duration, it still is the only evidence that we have as to the usage of the car. And ... there is no reason to think that it was different on this particular occasion.

\* \* \*

There is also evidence, when we look at ... the search warrant application and also the return ... for the Jones home ... that there are also many, many handgun-related items in ... the family home that was occupied by [appellant] and Ms. Tammy Jones.

And that includes a box of the kind of ammunition which is consistent with use on the body.

\* \* \*

In the woods behind the house, there are slugs from a .45, again consistent with the type of ammunition used.

\* \* \*

.... There is no .45 caliber handgun that is found. Let me invite counsel to correct me, if I'm wrong. There's a 9 millimeter, but there is no .45. And yet they have all this .45 ammunition and they've got .45 slugs, apparently target practice, in the backyard.

So it does appear to me that it is a viable argument by the State to suggest that there was a .45 caliber handgun which was in their possession, which apparently normally might have been in the home. And the police did a thorough search of the home, and they didn't find it. So apparently it was disposed of.

\* \* \*

In this case, putting all of those strands of evidence together, I am convinced beyond a reasonable doubt that [appellant] ... was the person sitting in the passenger's seat, the person who, in greatest likelihood, from the reconstruction of the event, fired the gun from the passenger's seat, who handled the body of the victim, Mr. Darnell Brown, either

before, during or after the time that he was dying, leaving his DNA in the pockets, and who apparently also disposed of the cell phone, since it was right there next to where he was reaching into the right-hand pocket, and putting all of that evidence together I am convinced beyond a reasonable doubt that the [c]ourt must find him guilty of second degree murder. . . .

## Discussion

### A. *Motion to Suppress*

Appellant's first contention is that the police were unlawfully on his property because the "No Trespassing" sign, which the court found as a fact was on the property, precluded police entry onto the property, and moreover, there was no valid consent to search. We disagree.

When reviewing a circuit court's denial of a motion to suppress, our scope is ordinarily limited to the record of the suppression hearing and does not include the record of the trial. *Myers v. State*, 395 Md. 261, 274, 909 A.2d 1048 (2006) (*citing Byndloss v. State*, 391 Md. 462, 477, 893 A.2d 1119 (2006)). We consider the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the party prevailing on the motion, in this case, the State. *State v. Nieves*, 383 Md. 573, 581, 861 A.2d 62 (2004). Ordinarily, we will give great deference to a hearing judge's factual findings, and we will not disturb them unless they are clearly erroneous. *Id.* at 581–82, 861 A.2d 62.

### 1. Effect of "No Trespassing" Sign

Appellant first contends that the initial entry onto his property was unlawful, based on the presence of a "No Trespassing" sign, but he cites no authority on point to support that proposition. We are not aware of any reported Maryland decisions in which the issue has been decided. Nevertheless, we have little difficulty in concluding that the initial entry by the police officers was lawful.

In *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the Supreme Court established that police officers are permitted to enter and search an open field without a warrant because the owner has no reasonable expectation of privacy in such areas. *Id.* at 59, 44 S.Ct. 445. This frequently has been referred to as the "open field" doctrine.

■ In discussing Fourth Amendment protection, courts often discuss property law and the common law concept of curtilage, i.e., the home and its immediate area used for living purposes. In the early days of Fourth Amendment jurisprudence, those concepts were applied more rigidly than now, as we have gravitated toward a totality of the circumstances analysis. While property law and curtilage remain relevant, it is now clear that property law does not control Fourth Amendment analysis, *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 304, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Oliver v. United States*, 466 U.S. 170, 183, n. 15, 104 S.Ct. 1735, 80 L.Ed.2d 214(1984) (trespass law not synonymous with scope of Fourth Amendment protection), and concepts of "open field" and curtilage are often used to distinguish those areas in which an occupant has no reasonable expectation of privacy from those in which the occupant does. *United States v. Dunn*, 480 U.S. 294, 300–01, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (the Fourth Amendment protects people, and what a person knowingly exposes to the public, even in a home, is not protected, and conversely, Fourth Amendment protection may exist outside the home or curtilage).[2] Since *Katz*, the focus has been on whether the individual in question manifests a subjective expectation of privacy and, if so, whether it is reasonable. *California v. Ciraolo*, 476 U.S.

---

**2.** In *Katz*, the Supreme Court held that the defendant had an expectation of privacy in a telephone booth while making a call. The defendant's call was monitored through an electronic device. The Court observed that the defendant was entitled to assume that his words would not be "broadcast to the world." *Katz*, 389 U.S. at 351–52, 88 S.Ct. 507.

207, 211–12, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).[3] The second prong, whether it is reasonable, is measured objectively, and focuses not only on the place involved but also on what type and manner of intrusion the individual wants to keep from invading his privacy. *Widgren v. Maple Grove Township*, 429 F.3d 575, 579 (6th Cir.2005).

In *Oliver*, police officers entered the defendant's property to investigate a report that marijuana was being grown on the property. The property contained no trespassing signs. The officers saw growing marijuana. The Supreme Court held that the defendant had no legitimate expectation of privacy in the open land, explaining that open lands "usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be." *Oliver*, 466 U.S. at 178, 104 S.Ct. 1735. In reaffirming its decision in *Hester*, the Court further explained that an open field does not necessarily mean that the area be open or a field, as those words are used in common speech. *Id.* at 180, n. 11. In comparing trespass law with the interests protected by the Fourth Amendment, the Court noted that a right to exclude a person under trespass law does not necessarily embody a Fourth Amendment interest, the former being to exclude and protect against thieves and vandals. *Id.* at 183, n. 15.

In *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), police officers went to a house to investigate information that the defendant was involved in drug trafficking. When the police approached, the defendant was standing in the doorway, neither within the house nor entirely outside of the house. *Id.* at 42, 96 S.Ct. 2406. The question was whether the defendant was in a public place,[4] and the

---

**3.** In *Ciraolo*, police officers, from an airplane flying in navigable space, observed growing marijuana in a fenced garden behind a residence. *Id.* at 214–15, 106 S.Ct. 1809. The Supreme Court stated that even though the garden may have been within the curtilage, that did not bar police observation of areas that could be observed by any member of the public flying in navigable space, because there was no reasonable expectation of privacy with respect to such surveillance.

**4.** The defendant was ultimately arrested inside of the house, having fled when the police arrived. The Court held the officers were entitled to hot pursuit, and the arrest was lawful.

Court answered that in the affirmative, explaining that she was exposed to public, view, speech, hearing, and touch.

In the case before us, the front of the house and the door were exposed to the public, and appellant had no reasonable expectation of privacy with respect to entry of the yard and a knock on the door by investigating police officers. *See Christian v. State,* 172 Md.App. 212, 222, 914 A.2d 151 (2007) (defendant had no expectation of privacy in area between screen door, that was observed open, and solid entry door of house); *Fitzgerald v. State,* 153 Md.App. 601, 666–67, 837 A.2d 989 (2003), *aff'd on other grounds,* 384 Md. 484, 864 A.2d 1006 (2004) (vestibule of an apartment house same as an open field, and police had a right to be there).

The principles applied in the above cases lead to the conclusion that police officers who, on legitimate business, approach a dwelling to ask questions do not commit an unlawful search or seizure of property. *See United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (A search occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed." A seizure of property occurs "when there is some meaningful interference with an individual's possessory interests in that property.").

Similarly, police officers on legitimate business, in approaching a dwelling to ask questions, do not commit an unlawful seizure of the person. This conclusion is consistent with the fact that, generally, when police officers approach a person to ask questions, an accosting, they have not seized the person. *Ferris v. State,* 355 Md. 356, 374–75, 735 A.2d 491 (1999). It may become a seizure, depending on the level of restraint and whether the person feels free to leave. *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

Almost all courts that have considered the issue have agreed with the above principles. The Court of Appeals so held in *Scott v. State,* 366 Md. 121, 782 A.2d 862 (2001), citing

*Davis v. United States,* 327 F.2d 301, 303 (9th Cir.1964).[5] Referring to the process as the right to "knock and talk," the Court held that police officers may approach a dwelling, knock on the door, identify themselves as police officers, and ask questions, including whether they can conduct a search. *Id.* at 129, 782 A.2d 862. The only requirement is that the officers "be on some legitimate official business." *Id.* at 129–30.[6] *See Brown v. State,* 378 Md. 355, 357–61, 835 A.2d 1208 (2003) (reaffirming *Scott* and upholding knock and talk when a police officer approached a door to a motel, responded "maintenance" when the occupant asked who was there, and identified himself as a police officer when occupant opened door).

In the case before us, the presence of the "No Trespassing" sign does not change the analysis or the result that would otherwise obtain. For Fourth Amendment purposes, appellant could not have had a reasonable expectation that the "No Trespassing" sign would or should prevent visitors with a legitimate purpose from walking to the front door, including police officers in furtherance of an investigation. The Supreme Court has held (1) that the threshold of a home is not a protected area when voluntarily exposed, *Santana,* 427 U.S. 38, 96 S.Ct. 2406, and (2) open land not otherwise subject to a reasonable expectation of privacy is not made so by the

---

**5.** The *Davis* court, in sustaining a mid-day encounter, stated, "[a]bsent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law."

**6.** In *Scott,* the defendant was in a motel room, and he did not challenge the right of the police officer to be in the common areas. The right to approach a dwelling is not limited to multiple dwelling units separated by common areas, however. The Scott Court cited *State v. Cloutier,* 544 A.2d 1277, 1280 (Me.1988) with approval, in which a private dwelling was involved, including its statement that an owner impliedly invites those with a legitimate social or business purpose to intrude upon the owner's property. Additionally, courts recognizing the knock and talk rule have generally applied it to private residences.

presence of a no trespassing sign, even if the investigating officer sees it. *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214.

Courts in other jurisdictions, on facts similar to those before us, have reached the same conclusion. *See, e.g., Wysong v. Florida,* 614 So.2d 670 (Fla.App.1993), and *State v. Poppe,* 131 Or.App. 14, 883 P.2d 905 (1994). We have not undertaken a comparative analysis of all of the cases involving no trespassing signs, but we note that courts have been very consistent in concluding that no trespassing signs, in and of themselves, do not make a police officer's entry on property unlawful. The presence of no trespassing signs may be considered as part of the totality of the circumstances, however. *See, e.g., Keenom v. State,* 349 Ark. 381, 390, 80 S.W.3d 743 (2002) (officers exceeded right to knock and talk when officer witnessed what he believed to be suspicious behavior by a then unidentified person, ascertained the person's identity, obtained the assistance of other officers, caravanned to the person's rural residence, went past no trespassing signs, knocked on the door and attempted to obtain the person's consent to search, and after he refused, kept him outside in cold weather for 20 to 45 minutes, without permitting him to reenter his residence to obtain a coat, before arresting him); *see* cases collected in 60 A.L.R. 5th 1, § 11, discussing reasonable expectation of privacy in driveways, when no trespassing sign posted on or near driveway.

Appellant relies on *Beale v. State,* 230 Md. 182, 186 A.2d 213 (1962) and *Brown v. State,* 75 Md.App. 22, 540 A.2d 143 (1988), but they do not support his position. In *Beale,* a police officer entered an enclosed back yard, without permission, and observed the defendant throw narcotics paraphernalia from a window when another police officer approached the front door. The facts in that case are clearly distinguishable from the case before us, where the officers walked through an open area to the front door.

In *Brown,* police officers entered the property in question to investigate a report of illegal activity. This Court stated that

it was proper to enter the property for that purpose, noting that the front door area was entitled to extremely limited Fourth Amendment protection because the defendant was not entitled to an expectation of privacy in an area in which the public was welcome. The police did invade the defendant's rights, however, when after receiving no answer to their knock, they entered a back yard, enclosed by a stockade type fence, and which was used for both outdoor eating and laundering clothes. *Brown,* 75 Md.App. at 34, 540 A.2d 143.

### 2. Validity of Consent

■ Appellant next contends that Ms. Jones "could only have reasonably concluded that she had no choice but to agree to the police 'requests' " to search. We disagree and conclude that once the officers were lawfully on the property, Ms. Jones voluntarily consented to the search.

■ It is well settled that a warrantless search is per se unreasonable, subject only to a few specifically established and well-delineated exceptions, one of which is a search conducted pursuant to consent. *Abeokuto v. State,* 391 Md. 289, 334, 893 A.2d 1018 (2006) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). For consent to search to be effective, it must have been given freely and voluntarily. *Abeokuto,* 391 Md. at 334, 893 A.2d 1018 (citing *Schneckloth,* 412 U.S. at 222, 93 S.Ct. 2041). Consent may be given by a third party having common authority over the property, *see, e.g., United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), or having apparent authority to consent. *See Illinois v. Rodriguez,* 497 U.S. 177, 187–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Ultimately, to determine whether the State met its burden of proving that effective consent was given, we consider the totality of the circumstances. *Abeokuto,* 391 Md. at 334, 893 A.2d 1018 (citing *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041). See *Scott,* 366 Md. at 140–45, 782 A.2d 862.

In the case sub judice, both Detective Lee and Detective Johns testified that after asking Ms. Jones if there was

somewhere that they could speak to her, she suggested the building next door to the house. Ms. Jones, who was "very friendly" and "willing to talk" to the officers, opened the door to the building and told the officers to "come on in." After asking Ms. Jones about the car that her mother had rented, Ms. Jones told the officers that it was in the other building. Ms. Jones said that she would not mind if the officers observed the vehicle, but that she had to get the key to the building, which she did. After retrieving the key, Ms. Jones "let [the officers] in" the building, and subsequently retrieved the key to the car located in that building. Under the totality of the circumstances, we conclude that consent was freely and voluntarily given. We perceive no error.

### B. *Sufficiency of the Evidence*

Appellant's second argument is, essentially, that the evidence was insufficient to support a finding that "the shooter must have been the passenger in the car and that [a]ppellant must have been the passenger."

When, as here, an action has been tried without a jury, the appellate court will review the case on both the law and the evidence, and will not set aside the judgment of the trial court on the evidence unless clearly erroneous. Maryland Rule 8–131(c). The standard for reviewing the sufficiency of the evidence is "whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see State v. Smith,* 374 Md. 527, 533, 823 A.2d 664 (2003). We give "due regard to the [fact finder's] findings of facts, its resolution of conflicting evidence, and significantly, its opportunity to observe and assess the credibility of witnesses." *Harrison v. State,* 382 Md. 477, 488, 855 A.2d 1220 (2004) (*citing Mc-Donald v. State,* 347 Md. 452, 474, 701 A.2d 675 (1997)), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998) (*quoting State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336 (1994)). "We do not measure the weight of the evidence;

rather we concern ourselves only with whether the verdict was supported with sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *McDonald,* 347 Md. at 474, 701 A.2d 675 (*citing Albrecht,* 336 Md. at 478–79, 649 A.2d 336).

In this case, there was substantial circumstantial evidence tending to demonstrate that appellant was the shooter. Appellant's DNA was found in the victim's pocket, linking him to the crime scene. After hearing testimony, resolving conflicting evidence, and assessing the credibility of the witnesses, the court concluded that "most of the time," appellant and Ms. Jones were in the car together, and "all but one time [appellant] was the passenger and she was the driver." The court further found that a person shooting from the driver's side would have to assume an unnatural position in order to fire the gun in the necessary trajectory. Furthermore, boxes of .45 caliber bullets and spent slugs, consistent with the ammunition used to shoot the victim, were found on appellant's property, although no .45 caliber handgun was found, suggesting that appellant disposed of the evidence. Moreover, the vehicle containing blood stains and a bullet hole was found on appellant's property. Thus, we conclude that the evidence was sufficient to sustain appellant's conviction for second-degree murder, or, at the very least, as an accomplice thereto. *See, e.g., State v. Raines,* 326 Md. 582, 598 (1992) (noting that "when two or more persons participate in a criminal offense, each is responsible for the commission of the offense. . . .").

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**