# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
June 2, 2016 Session Heard at Nashville

## STATE OF TENNESSEE v. JAMES ROBERT CHRISTENSEN, JR.

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Tipton County**
**No. 7799      Joseph H. Walker III, Judge**

---

**No. W2014-00931-SC-R11-CD – Filed April 7, 2017**

---

SHARON G. LEE, J., dissenting.

The maxim, "every man's house is his castle," is deeply rooted in our jurisprudence. *Weeks v. United States*, 232 U.S. 383, 390 (1914). It applies whether the house is a castle or a cottage—a mansion or a mobile home.[1] The right to retreat into the privacy of one's home and be free from governmental intrusion is a basic tenet of the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution. Our homes and adjoining land are protected spaces; governmental officers must have a warrant, absent special circumstances, to intrude onto this private area.

Today, the Court holds that the posting of multiple "No Trespassing" signs is not enough to protect our constitutional rights against a warrantless search and that it may take "a fence and a closed gate that physically block access to the front door of a house" to revoke the implied license to enter the land around a residence.

I disagree that we must barricade our homes with a fence and a closed gate, and perhaps even a locked gate, to protect our constitutional rights against warrantless searches. This option is rarely convenient, affordable, practical, or even possible. Revocation of implied consent to enter one's property should be available to all—not just to those citizens who can afford to erect a fence and a gate and live in an area where this form of barricade is possible.

---

[1] "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!" *Miller v. United States*, 357 U.S. 301, 307 (1958) (quoting remarks of William Pitt, Earl of Chatham, during 1763 debate in Parliament) (internal quotation marks omitted).

A search occurs when the government obtains information through an actual physical intrusion into a constitutionally protected area[2] or by violating a person's reasonable expectation of privacy.[3] By ignoring the "No Trespassing" signs, the officers physically intruded into Mr. Christensen's constitutionally protected area and violated his reasonable expectation of privacy.

*Physical Intrusion*

A person's right to retreat into his home and be free from unreasonable government searches and seizures stands at the very core of the Fourth Amendment's protections.[4] "This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity . . . ." *Jardines*, 133 S. Ct. at 1414. The protections of the Fourth Amendment extend to the curtilage of a home. *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

Visitors have an implied license to enter another person's property and step onto the front porch. The Supreme Court has held that "'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.'" *Id.* at 1415 (quoting *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)).[5] This license also extends to law enforcement. *Id.* at 1416 ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" (quoting *King*, 563 U.S. at 469)).

A citizen may revoke the public's implied license to enter his property. Police officers may lawfully "knock and talk" at a citizen's front door without having probable cause or reasonable suspicion, but *not* when the citizen has expressly revoked the implied

---

[2] *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)).

[3] *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring); *see also Jardines*, 133 S. Ct. at 1417.

[4] *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also Kentucky v. King*, 563 U.S. 452, 474 (2011) (Ginsburg, J., dissenting) ("In no quarter does the Fourth Amendment apply with greater force than in our homes . . . .").

[5] *See also State v. Cothran*, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003) ("A sidewalk or pathway leading from a public street to the front door of a residence represents an 'implied invitation' to the public to use the pathway in pursuing legitimate business or social interests with those inside the residence." (quoting *State v. Harris*, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995))).

license to enter. *State v. Blackwell*, No. E2009-00043-CCA-R3-CD, 2010 WL 454864, at *7 (Tenn. Crim. App. Feb. 10, 2010).[6]

Mr. Christensen sufficiently revoked the public's implied license to enter his property by posting multiple "No Trespassing" and "Private Property" signs near the entrance to his driveway. A person need not have a law degree or an understanding of the various legal nuances of "trespass" discussed by the Court to know that these signs meant visitors were not welcome. Ms. Tammy Atkins, who visited homes in the area to share her faith, understood the meaning of the signs. She testified there were several "No Trespassing" signs near Mr. Christensen's driveway, and she did not go to houses that had "No Trespassing" signs.

Courts across the country have taken different approaches when determining whether an individual has revoked the public's implied license for entry onto his property. In Tennessee, the Court of Criminal Appeals has held that "No Trespassing" signs, even without physical barriers such as fences and gates, are sufficient to revoke the public's implied license to enter. *Blackwell*, 2010 WL 454864, at *7 (acknowledging that a "knock and talk" is generally a lawful technique absent express orders against trespass, but the presence of a "No Trespassing" sign evidences a subjective expectation of privacy and a revocation of the implied license to enter the property); S*tate v. Draper*, No. E2011-01047-CCA-R3-CD, 2012 WL 1895869, at *1, *6 (Tenn. Crim. App. May 24, 2012) (quoting *Blackwell*, 2010 WL 454864, at *7) (ruling a search was illegal where an officer bypassed the front door, entered the backyard, and knew that the owner had posted "No Trespassing" signs, which effectively revoked the implied invitation of the front door); *see also State v. Henry*, No. W2005-02890-CCA-R3-CD, 2007 WL 1094146, at *5 (Tenn. Crim. App. Apr. 11, 2007) (holding a "knock and talk" permissible but noting that if there had been evidence that "No Trespassing" signs were present at the time of the search, the "knock and talk" would have been unacceptable).

---

[6] *See also United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) ("'Absent express orders from the person in possession,' an officer may 'walk up the steps and knock on the front door of any man's "castle," with the honest intent of asking questions of the occupant thereof.'" (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964))); *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (quoting *Davis*, 327 F.2d at 303); *United States v. Taylor*, 90 F.3d 903, 909 (4th Cir. 1996) (quoting *United States v. Hersh*, 464 F.2d 228, 230 (9th Cir. 1972)); *United States v. Holmes*, 143 F. Supp. 3d 1252, 1259 (M.D. Fla. 2015) (holding that a person may revoke the implied license but must do so expressly (quoting *Taylor*, 458 F.3d at 1204)); *State v. Grice*, 767 S.E.2d 312, 319 (N.C. 2015) (finding that the implied license to approach the front doors of homes may be limited or rescinded by clear demonstrations by the homeowners (citing *Jardines*, 133 S. Ct. at 1415–16)), *cert. denied*, 135 S. Ct. 2846 (2015).

These Tennessee cases are consistent with decisions from other jurisdictions that have also determined that "No Trespassing" signs, without physical barriers, are sufficient for a person to preserve his privacy and revoke the implied license to enter his property. *See Powell v. State*, 120 So. 3d 577, 584 (Fla. Dist. Ct. App. 2013), *on reh'g* (Aug. 1, 2013) (stating that homeowners who post "No Trespassing" or "No Soliciting" signs effectively negate the license to enter the property and conduct a "knock and talk"); *State v. Roubique*, 421 So. 2d 859, 861–62 (La. 1982) (finding a "Private Road, No Trespassing" sign at the entrance to the driveway was ample evidence of the resident's intent to preserve his privacy); *see also State v. Poulos*, 942 P.2d 901, 904 (Or. Ct. App. 1997) (indicating that "No Hunting or Trespassing Under Penalty of Law," "KEEP OUT," "Guard Dog on Duty," and "STOP" signs posted along the driveway were sufficient to communicate the property owner's intent to exclude the public even without a gate or barrier).[7]

In other jurisdictions, courts have held that the expectation of privacy and desire to restrict entry can be effectuated by either physical barriers *or* appropriate signage. *See People v. Scott*, 593 N.E.2d 1328, 1338 (N.Y. 1992) (holding that "where landowners fence or post 'No Trespassing' signs on their private property or, by some other means, indicate unmistakably that entry is not permitted, the expectation that their privacy rights will be respected and that they will be free from unwanted intrusions is reasonable"), *quoted in State v. Bullock*, 901 P.2d 61, 74 (Mont. 1995); *Dixson*, 766 P.2d at 1024 (stating that signs, such as "No Trespassing" signs, fences, or other similar measures indicate the property owner's intent to protect privacy and exclude the public); *Cooksey v. State*, 350 S.W.3d 177, 184 (Tex. Ct. App. 2011) (stating that a homeowner may manifest an expectation of privacy, restrict access to pathways leading to the house, and revoke the implied license by erecting a locked gate or by posting "No Trespassing" signs); *see also State v. Hubbel*, 951 P.2d 971, 977 (Mont. 1997) (holding that the property owner had no reasonable expectation of privacy in the property leading to the front door where the property owner did not erect a fence, place a gate, plant shrubs or

---

[7] Under this approach, signs may be sufficient to revoke the implied license, but they must be appropriately worded and placed. *See Holmes*, 143 F. Supp. 3d at 1262 (noting that other courts have required that the revocation of the implied license be accomplished by clear demonstrations that are unambiguous and obvious to the casual visitor); *State v. Kapelle*, 344 P.3d 901, 905 (Idaho Ct. App. 2014) (noting that where a "No Trespassing" sign is ambiguous and not clearly posted, the implied license is not revoked); *State v. Howard*, 315 P.3d 854, 860 (Idaho Ct. App. 2013) (finding that the implied license had not been revoked because the "No Trespassing" sign was very small and not easily noticed, was not posted over or next to the entrance to the curtilage, and was over a mile from the actual residence); *State v. Dixson*, 766 P.2d 1015, 1024 (Or. 1988) (en banc) (finding that "No Hunting" signs were insufficient to communicate to law enforcement an intent to exclude non-hunting access).

-4-

bushes, or post "No Trespassing" or other signs), *as modified on denial of reh'g* (Feb. 3, 1998).

Another approach taken by courts in other jurisdictions is to determine whether the public's implied license to enter has been revoked by considering the totality of the circumstances, with a "No Trespassing" or similar signage a factor to be considered. *See Powell*, 120 So. 3d at 584 (finding that the existence and extent of a license to conduct a "knock and talk" depends on the circumstances); *Jones v. State*, 943 A.2d 1, 12 (Md. Ct. Spec. App. 2008) (finding that "No Trespassing" signs may be considered as part of the totality of the circumstances); *State v. Kuchera*, Nos. 27375-6-II, 27376-4-II, 2002 WL 31439839, at *5 (Wash. Ct. App. Nov. 1, 2002) (holding that the presence of "No Trespassing" signs "is not dispositive of the establishment of privacy, but is a factor to be considered 'in conjunction with other manifestations of privacy'" (quoting *State v. Johnson*, 879 P.2d 984, 992 (Wash. Ct. App. 1994))).

Under any of these approaches and particularly under existing Tennessee law, Mr. Christensen revoked the public's implied license to enter his property. Near the entrance to his driveway, he posted two signs that said "PRIVATE PROPERTY, NO TRESPASSING" and one sign that said "NO TRESPASSING, HUNTING OR FISHING, VIOLATORS PROSECUTED, UNDER PENALTY OF LAW" and listed his phone number. These signs were clearly visible to anyone approaching his driveway from the main road. Even in the absence of a fence or other physical barrier, the signs effectively communicated Mr. Christensen's intent to protect his privacy and exclude others from approaching his home. As the Idaho Supreme Court has said, "[C]itizens, especially those in rural areas, should not have to convert the areas around their homes into the modern equivalent of a medieval fortress in order to prevent uninvited entry by the public, including police officers." *State v. Christensen*, 953 P.2d 583, 587 (Idaho 1998).

The Court appears to adopt the totality of the circumstances approach but then determines that an objectively reasonable person faced with a "No Trespassing" sign would not conclude that entry is barred. I disagree. Common sense tells us that "No Trespassing" signs, depending on the circumstances, can communicate the property owner's desire not to have members of the public on his land.[8] Moreover, a "No

---

[8] *Cf. Madruga v. County of Riverside*, 431 F. Supp. 2d 1049, 1061 (C.D. Cal. 2005) (noting that even if signs do not contain the words "No Trespassing" or "Keep Away" "[c]ommon sense and common experiences teaches us that such 'WARNING Guard Dog' signs are placed to dissuade people, be they intruders, sales representatives, delivery agents, or even police officers, from approaching the home. . . . [A]nyone seeing such a sign would understand that the homeowner seeks to exclude them from entering the area beyond the sign.").

Trespassing" sign should be of particular significance to law enforcement officers in communicating that they may need to obtain a warrant before entering the property.

"No Trespassing" signs factor into criminal trespass cases. In Tennessee, it is a crime to enter or remain on property without the owner's consent. Tenn. Code Ann. § 39-14-405(a). A defense to this crime is that the alleged trespasser reasonably believed that he had the owner's consent to enter the property. *Id.* § 39-14-405(b)(1). However, this defense is not available if the property owner has posted signs "visible at all major points of ingress to the property . . . and the signs are reasonably likely to come to the attention of a person entering the property." *Id.* § 39-14-405(c).

Mr. Christensen did not just post one "No Trespassing" sign—he posted multiple signs near the entrance to his property that were clear, unambiguous, and obvious to anyone approaching his driveway. These signs adequately communicated Mr. Christensen's intent to revoke the implied license to enter his property. Under the facts of this case, law enforcement officers should have heeded the signs and taken the appropriate steps to obtain a search warrant.

*Expectation of Privacy*

Without a physical intrusion, a search can occur when the government violates a subjective expectation of privacy that society is prepared to recognize as reasonable. *Katz*, 389 U.S. at 361 (Harlan, J., concurring).[9] To determine whether a search has occurred under the *Katz* analysis, courts consider whether the individual had an actual, subjective expectation of privacy and whether society will view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances. *State v. Talley*, 307 S.W.3d 723, 730 (Tenn. 2010) (quoting *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001)).

In deciding whether Mr. Christensen had an actual, subjective expectation of privacy, we apply a multi-factor test that inquires into whether the defendant owns the property seized; has a possessory interest in the thing seized and the place searched; has the right to exclude others from that place; has shown a subjective expectation that the

___

[9] *See also Jardines*, 133 S. Ct. at 1417 ("The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas."); *Jones*, 565 U.S. at 407 ("*Katz* did not erode the principle 'that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment.'" (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring))).

place would remain free from governmental invasion; took normal precautions to maintain his privacy; and was legitimately on the premises. *State v. Ross*, 49 S.W.3d 833, 841 (Tenn. 2001) (quoting *United States v. Haydel*, 649 F.2d 1152, 1154–55 (5th Cir. 1981)); *see also Talley*, 307 S.W.3d at 730–31.

Under this test, Mr. Christensen had an actual, subjective expectation of privacy in his property. He owned the property, had a possessory interest in the place searched, had the right to exclude others from the property, showed a legitimate interest in keeping others off his property, took precautions to maintain his privacy by posting multiple "No Trespassing" signs, and was legitimately on the premises.

To determine whether society views Mr. Christensen's subjective expectation of privacy as reasonable and justifiable, we consider factors such as the "intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion." *Oliver*, 466 U.S. at 177–78 (citations omitted).

Privacy expectations are heightened in the home and the adjacent area. *See Dow Chem. Co. v. United States*, 476 U.S. 227, 237 n.4 (1986). The Court in *Katz* held that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But *what he seeks to preserve as private*, even in an area accessible to the public, *may be constitutionally protected*." *Katz*, 389 U.S. at 351 (emphases added) (citations omitted).

Mr. Christensen did not expose his home and the adjoining property to the public; instead, he tried to protect his property by posting multiple signs clearly communicating that visitors were not welcome. If multiple "No Trespassing" signs are not sufficient to convey a property owner's intent to exclude the public from his property, then the constitutional protections against unreasonable searches may be beyond the grasp of ordinary citizens for whom the posting of "No Trespassing" signs is the only feasible option.

Mr. Christensen's expectation of privacy by the posting of multiple "No Trespassing" signs was reasonable and justifiable under the circumstances. Police officers violated Mr. Christensen's reasonable expectation of privacy when they entered his land without a warrant despite the "No Trespassing" signs.

*Conclusion*

For the reasons stated, law enforcement officers conducted an illegal search of Mr. Christensen's property, and the evidence obtained from the search should be suppressed.

The Court's decision that multiple "No Trespassing" signs are not sufficient to revoke the implied license for entry denies ordinary citizens the protections of the United States and the Tennessee Constitutions against warrantless searches. The result is that only citizens wealthy enough and situated in an area where they can "convert the areas around their homes into the modern equivalent of a medieval fortress," *Christensen*, 953 P.2d at 587, may protect themselves from governmental intrusion and invasion of privacy.

_____
SHARON G. LEE, JUSTICE