KAHN, J.
 

 The State seeks review of an order granting Stephen DeLuca’s motion to suppress evidence obtained as a result of what the trial court called an illegal detention. The issue is whether officers had justification, based on a detailed 911 call, to detain DeLuca and investigate the report of his criminal activity. Because the trial court’s characterization of the informant as an “anonymous tipster” relied solely on information discovered after the detention commenced, and the totality of the circumstances indicate the police reasonably believed the incident report was verifiable and reliable when the detention began, we conclude the motion was granted in error. Accordingly, we reverse the order and remand for further proceedings.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 No dispute exists as to the material facts leading to DeLuca’s arrest. Around 1:30 a.m. on February 28, 2009, a police radio “be-on-the-lookout” (BOLO) dispatch reported two white men in a vehicle pulled a black 9-mm handgun on a man named Cecil Brown in the area of Carolina and Macomb Streets in Tallahassee. One of the gunmen reportedly wore a hat. This information derived from a 911 call to the police by a caller who identified himself as the victim, Cecil Brown. The caller provided a cell phone number where he could be reached, specifically described his cloth
 
 *122
 
 ing (bluejeans, a black turtleneck, and a green Miami Hurricanes jacket), identified his street corner location, and described the gunmen’s vehicle as a black GMC Yukon bearing license plate number 285WZX and displaying a Florida State University decal on its rear window. The caller reported the vehicle was heading west near the 500 block of Tennessee Street.
 

 Under its standard procedure, the Tallahassee Police Department (TPD), after receiving a report from a victim of a violent street crime, dispatches to the crime site to investigate the report and also attempts to pursue armed suspects based on the information in the BOLO. According to police records, at 1:33 a.m. the victim still reported he was at the same location, and TPD Officer Johnson (who did not testify at the suppression hearing) arrived in the vicinity of the reported crime at 1:34 or 1:35 a.m. Almost simultaneously, TPD Officer Harriett, then on patrol, heard another officer’s report indicating the gunmen’s vehicle was proceeding through the 1000-1100 block of West Tennessee Street. Yet a third officer reported seeing the GMC Yukon near Tennessee Street and High Road. No later than 1:39 or 1:40 a.m., Officer Harriett spotted the dark GMC Yukon and believed the two suspects were present. At that point, Officer Harriett knew the investigators had “lost contact” with Mr. Brown, as if the caller’s phone were dead or disconnected. When Officer Harriett saw the vehicle, he knew other investigators were still actively looking for Mr. Brown and were trying to re-establish phone contact with him, although unsuccessful so far.
 

 The unoccupied GMC Yukon, with the license tag number and FSU decal, exactly as reported, was parked in front of a gas station/convenience store at Tennessee and Call Streets, not far from the reported incident site. Although spying a number of people in the parking lot, Officer Harriett saw only two white men (one wearing a hat). These men stood directly beside the FSU decal-bearing GMC Yukon. Harriett believed the two men were the subjects of the 911 call. Significantly outnumbered and knowing the men were reportedly armed, Officer Harriett exited his police vehicle and ordered everyone to sit on the ground for safety reasons. Everyone complied with the order except the white man who was not wearing a hat.
 

 At the suppression hearing, Officer Harriett ultimately identified appellee DeLuca as the man who refused to sit down. Harriett further explained that DeLuca maintained a defiant, threatening stance and demeanor despite repeated warnings to calm down, sit on the ground, and be still. DeLuca began cursing, crept toward the Yukon on all fours, and eventually lunged in front of the Yukon out of Harriett’s sight. Officer Harriett ran to where he could see DeLuca and ordered DeLuca to show his hands. DeLuca refused this command and began “belly-crawling” toward the officer. TPD Officer Gates, by then on the scene, handcuffed DeLuca. During the detention, Officer Harriett looked under the Yukon where DeLuea’s arm had been and found several packets of white powder, some of which was cocaine.
 

 Sometime after the arrest, TPD determined it could not verify the call from Cecil Brown. DeLuca’s companion, Prescott, claimed that he and DeLuca had a disagreement with a “panhandler” earlier. TPD never located the supposed Cecil Brown. Neither did officers find a handgun.
 

 Charged with drug offenses and resisting without violence, DeLuca moved to suppress essential evidence on the grounds that the 911 caller was merely an anonymous tipster; the police had no independent corroboration of suspicious conduct
 
 *123
 
 by DeLuca to bolster the inherently unreliable tip and to justify detaining him; and, the resulting detention and investigation of DeLuca was illegal. After an evidentiary hearing, the trial court issued the suppression order, finding that 1) the informant’s communication was tantamount to an anonymous call and his tip was thus unreliable; 2) law enforcement lacked any independent corroboration of criminal activity involving DeLuca that would create a reasonable suspicion justifying an investigatory stop under
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); 3) the resulting detention was illegal; and 4) the evidence seized during the detention must be suppressed pursuant to
 
 Baptiste v. State,
 
 995 So.2d 285 (Fla.2008). The court found the tipster left the area before the police responded and did not answer his cell phone when the dispatcher called him back. The court referred to evidence (acquired after the detention) that the informant “had a less than pure motive for the call”: he was a panhandler who confronted DeLuca shortly before making the call. The State has appealed the order. We have jurisdiction.
 
 See
 
 Rule 9.140(c)(1)(B), Florida Rules of Appellate Procedure.
 

 ANALYSIS
 

 We review the suppression order to determine whether competent substantial evidence supports the factual findings; we review de novo the trial court’s application of the law to the facts.
 
 See Ornelas v. United States,
 
 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (stating the ultimate determination of reasonable suspicion is an issue of law reviewed de novo);
 
 Connor v. State,
 
 803 So.2d 598, 608 (Fla. 2001). The trial court’s ruling on a motion to suppress enjoys a presumption of correctness on appeal, and we review the evidence and all reasonable inferences from it in a light most favorable to sustaining the order.
 
 See Pagan v. State,
 
 830 So.2d 792, 806 (Fla.2002). Article I, section 12 of the Florida Constitution requires Florida courts to construe search and seizure issues in conformity with the United States Supreme Court’s interpretation of the Fourth Amendment.
 
 See Holland v. State,
 
 696 So.2d 757, 759 (Fla.1997).
 

 Unquestionably, Officer Harriett’s order to the assembled crowd to sit on the ground was a “seizure” or detention for Fourth Amendment purposes.
 
 See Gipson v. State,
 
 667 So.2d 418, 419-20 (Fla. 5th DCA 1996). For a justified temporary detention, Officer Harriett must have had a reasonable suspicion of criminal activity.
 
 See
 
 § 901.151(2), Fla. Stat. (2008);
 
 Terry,
 
 392 U.S. at 24-26, 88 S.Ct. 1868;
 
 Baptiste,
 
 995 So.2d at 290. With regard to a BOLO dispatch, the Florida Supreme Court has directed:
 

 Several factors are relevant in assessing the legitimacy of a vehicle stop pursuant to a BOLO: (1) the length of time and distance from the offense; (2) route of flight; (3) specificity of the description of the vehicle and its occupants; and (4) the source of the BOLO information.
 

 Hunter v. State,
 
 660 So.2d 244, 249 (Fla.1995). Here, the first three factors overwhelmingly support the detention; the only dispute regarding the legitimacy of the detention relates to the fourth
 
 Hunter
 
 factor.
 

 “[W]hen the police act on the information of an informant, the reliability of that information must be established before a citizen can be stopped and frisked.”
 
 J.L. v. State,
 
 727 So.2d 204, 206 (Fla.1998),
 
 aff'd, Fla. v. J.L.,
 
 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000);
 
 see also State v. Manuel,
 
 796 So.2d 602, 605 (Fla. 4th DCA 2001) (“Whether the police have reasonable suspicion to stop a suspect based on information provided by an informant depends upon the credibility of the
 

 
 *124
 
 informant.”). The resolution of this issue depends in large part on “the classification to be given to the caller[ ]/informant[ ],”
 
 State v. Maynard,
 
 783 So.2d 226, 228 (Fla.2001), for “[ijnformants’ tips ... may vary greatly in their value and reliability.”
 
 Adams v. Williams,
 
 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The spectrum of reliability ranges from the relatively unknown veracity and reliability of an anonymous, unknown tipster whose assertions of criminal activity typically cannot be verified and thus require independent corroboration, to the presumed high reliability of a citizen-informer crime victim whose motivation in reporting illegality is the promotion of justice and public safety rather than financial gain, and who can be held accountable for the accuracy of the information given.
 
 See J.L.,
 
 529 U.S. at 270, 120 S.Ct. 1375;
 
 Maynard,
 
 783 So.2d at 228-30;
 
 Manuel,
 
 796 So.2d at 605;
 
 State v. Talbott,
 
 425 So.2d 600, 602 n. 1 (Fla. 4th DCA 1982);
 
 Barfield v. State,
 
 396 So.2d 793, 796 (Fla. 1st DCA 1981).
 

 As noted, the United States Supreme Court flatly refused to compose “[o]ne simple rule” for every situation.
 
 Adams,
 
 407 U.S. at 147, 92 S.Ct. 1921. As that Court noted:
 

 Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations — for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime — the subtleties of the hearsay rule should not thwart an appropriate police response.
 

 The trial court characterized the informant here as “anonymous,” thereby relegating his tip to “the low end of the reliability scale.” Given this initial determination, the court necessarily considered whether the police had any independent corroborative evidence to raise the informant’s reliability index.
 
 See Alabama v. White,
 
 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (noting that “[rjeasonable suspicion ... is dependent upon both the content of information possessed by police and its degree of reliability”);
 
 Maynard,
 
 783 So.2d at 229. The trial court here failed to note the appropriate nuance to the informant rule where the informant is the victim of the crime reported.
 

 The facts reasonably known to the officers when the detention commenced belie the court’s findings as to anonymity and initial unreliability.
 
 See State v. Evans,
 
 692 So.2d 216 (Fla. 4th DCA 1997). The 911 caller, identifying himself as Cecil Brown, described a recent incident involving two white males with a 9-mm handgun, and specifically described the getaway vehicle, including the license plate number and an FSU decal. Mr. Brown provided a cell phone number and a detailed description of his clothing, including the Miami Hurricanes jacket, gave a street location where the alleged armed incident occurred, and told police the travel direction of the Yukon.
 

 Based on this cumulative information, strongly suggesting its source as a reliable citizen-informer whose credibility could be verified, the BOLO was legally sufficient to trigger both an immediate investigation at the site of the alleged violent street crime and an expedited effort to locate the armed men in the moving vehicle. When Officer Harriett spotted the Yukon matching the BOLO, as other investigators simultaneously attempted unsuccessfully to locate the caller or re-establish cell phone contact with him, the officer had a reasonable or founded suspicion the only two white men standing beside the parked vehicle, one wearing the reported hat, were
 
 *125
 
 the subjects of the very recent 911 call. Just as the eventual discovery of a crime cannot bootstrap a preliminary illegal investigation,
 
 see J.L.,
 
 529 U.S. at 271, 120 S.Ct. 1375, the ultimate outcome here — the investigating officers’ ultimate inability to track down the caller either by phone or by location — did not divest Officer Harriett of the temporal requisite knowledge that reasonably justified the initial detention.
 

 We find, then, the trial court incorrectly classified the tip by relying solely on other information discovered by law enforcement after the lawful detention. Certainly this later information suggested the informer’s veracity and reliability were less stalwart than originally thought when TPD broadcast the BOLO.
 
 Cf. Baptiste,
 
 995 So.2d at 293 (noting “the fact that an anonymous tip ultimately proves to be accurate does not establish reasonable suspicion”). Nevertheless, belatedly acquired facts did not blemish the reasonable police actions here. The lawfulness of DeLuca’s detention depended on what the officers knew at its inception.
 
 See J.L.,
 
 529 U.S. at 271, 120 S.Ct. 1375.
 

 Likewise, the trial court misplaced its reliance on the materially distinguishable facts in
 
 Baptiste,
 
 995 So.2d at 285 (concluding that an anonymous 911 call stating that a black male wearing a white T-shirt and bluejean shorts waved a firearm in front of a supermarket did not provide a reasonable suspicion to initiate an investigative stop of defendant, who matched the description in the call, where the officer arrived at the scene and did not observe defendant engaged in any unlawful act, unusual conduct, or suspicious behavior). In reaching these conclusions, we note the absence of any unreasonable delay or biased actions by TPD.
 

 The citizen-informer initially provided sufficient information the police reasonably believed could be verified, and Officer Harriett observed the Yukon simultaneously with the police investigation of the reliability of the BOLO. A requirement that police be absolutely certain of the veracity and reliability of a victim/citizen-informer before detaining reportedly armed suspects, especially where no clear reason existed to question the caller’s information when the detention commenced, would unduly burden law enforcement and endanger the public.
 

 We REVERSE the suppression order and REMAND for further proceedings.
 

 ROWE and MARSTILLER, JJ., concur.