MAKAR, J.
Our state and federal constitutions declare that homes — whether castles or cabins, mansions or mobile homes — are protected spaces that require a warrant or other lawful basis to justify a governmental intrusion. At issue in this case is whether police officers entering the property of Russell Powell and Benjamin Wilb-ourn and peering into a window of their mobile home late at night after receiving an anonymous tip an hour earlier that marijuana plants were inside was a search that violated the Fourth Amendment. Because the officers intruded into a constitutionally protected area without a warrant and peered into a window from a part of the property where they had no lawful right to be, an unconstitutional search occurred.
I.
Lafayette County is best described as sparsely inhabited with the second smallest population of Florida’s 67 counties.[1] It is adjacent to the Big Bend[2] coastal region of the state and comprises about 550 square miles of agrarian lands, primarily pastures and woodlands. Its entire eastern border is the celebrated Suwannee River and its western border originally was the Gulf of Mexico. The county was split in two in 1921, rendering it landlocked; Dixie County, created from its southern part, now claims the Gulf coast.
At approximately 8:57 p.m. on Wednesday, December 29, 2010, the Lafayette County Sheriffs Department, which has a total of about eight or nine officers, received an anonymous call, which it redirected to Deputy Phil Shea’s cell phone. The caller said he had been at a party and saw marijuana plants, describing their location as “directly to the right when you enter through the front door of the mobile home.” He recently left the home and said that its residents were still there.
Deputy Shea immediately called Deputy Jaqueline Tysall, a school resource officer working back-up during the Christmas break, who accompanied him to the residence, both arriving at the property at approximately 10:17 p.m., a little over an hour after receipt of the anonymous call. Neither officer had sought a warrant to conduct a search of the mobile home.
The fenced property was “out in the country” in a “wooded area with pastures,” reachable via a gated dirt driveway. It was “full dark” when the officers arrived. The gate was open, and “No Trespassing” signs were not posted, so they entered and approached the mobile home intending to “question” its occupants to “see what they had to say.” As they drew near the single-wide mobile home, the officers saw a “little bonfire or campfire” in the yard with “drinks and stuff out there.” Lights were on inside the home and a dog was running loose in the yard. At the front of the mobile home, the deputies saw a “kind of a path to the front door” roughly outlined by scattered “junk and things” in the yard. The deputies followed the path and *581 approached the front door where a single step up was located. They knocked, identifying themselves as police officers, but no one answered. Deputy Tysall thought she heard something rustling, so she and Deputy Shea entered the back yard where some cows were in a pen at the far side of the property. The officers then approached the home from the rear and knocked on its back door, announced themselves, and again obtained no response.
Deputy Shea then went back to the front of the mobile home where he decided to look in a window that was about two feet to the left of the front door. He did so, telling Deputy Tysall that he saw marijuana plants inside. Deputy Tysall decided to the look in the window to verify what Deputy Shea saw. To see in the window, she had to stand to the left of the front door, at eye level with the window, off of the single door step. Deputy Tysall agreed she “could not observe anything through that window if [she was] actually on the step knocking on the door.” From the vantage point away from the front door, their faces no more than a hand’s length from the window pane, however, the deputies could see into the lighted living room area directly inside the window. By looking sharply to the right, they could see into the kitchen area back across the entryway — where the anonymous caller said the plants would be. There, under a table in the kitchen, the deputies saw a number of small marijuana plants under a grow light.
Next, Deputy Tysall called Deputy Geoffrey Condy, the county’s sole narcotics investigator, who soon arrived. Deputies Tysall and Shea explained the situation, telling Deputy Condy what window to look in. Following suit, Deputy Condy looked in the window — his face a “couple of inches” from the glass — and confirmed that the plants appeared to be marijuana. He then called an assistant state attorney who, upon being apprised of the situation, advised the officers to enter and secure the home.
At about 10:45 p.m., the three deputies — still without a warrant — entered the home through the unlocked back door (the front was locked). Powell was in the back bedroom, awake on his bed; Wilbourn was in the bathroom. Both were arrested, handcuffed, and seated on their living room couch. “Unhappy” with the situation, they said little except to call the officers “trespassers.”
At this point, Deputies Condy and Shea decided to leave to get a search warrant; Deputy Tysall remained to secure the scene. After obtaining a warrant, a search of the home was conducted and an inventory compiled: ten marijuana plants six to eight inches tall; a seedling; a few pipes; two lamps, and a digital kitchen scale. Other than the pipes, the search under the warrant produced nothing beyond what had already been observed by the deputies by looking in the window and via their warrantless entry of the home.
The officers involved testified that the only basis for entering the property was the anonymous phone call; no other alleged criminal activities had been reported; no emergency or exigent circumstances existed; officers were not in “hot pursuit” of anyone; and no probable cause existed to arrest anyone (until after they looked in the window and saw the plants). No threats were made by Powell or Wilb-ourn; no weapons were found.
Powell and Wilbourn were charged with possession and manufacture of cannabis and possession of a device, the scales, used in the manufacturing process. Both filed dispositive motions to dismiss the charges, claiming all the evidence against them (i.e., the inventory) was obtained via unconstitutional searches of their home. The trial *582 court held a suppression hearing at which Deputies Tysall and Condy testified (Deputy Shea no longer worked with the sheriffs department); three exhibits were entered (the search warrant, its supporting affidavit, and the inventory of the search). Powell and Wilbourn pled to the charges after the trial court summarily denied their motions, reserving their rights to lodge appeals, which we now address in this consolidated opinion.
II.
Powell and Wilbourn say it was error to deny their suppression motions because the evidence against them was obtained pursuant to two illegal searches of their home: the officers’ incursion into their back yard and the officers’ viewing of the marijuana plants by standing at and looking through the front window of their home. We address only that latter contention because it disposes of this case.
A.
The Fourth Amendment, which establishes the “right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures,” is often said to protect “people, not places” within its ambit. Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). But we know from its text that the Fourth Amendment grants explicit protection to a special place: one’s home.
With this focus in mind, Fourth Amendment analysis has evolved into two seemingly different, but somewhat interrelated, methods of identifying protectable interests. The more recently adopted formulation, also known at the Katz test, focuses on a person’s expectation of privacy. 389 U.S. at 361, 88 S.Ct. 507. Justice Harlan’s concurring opinion stated the test in its most familiar form: “first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as ‘reasonable.’ ” Id. at 361, 88 S.Ct. 507 (Harlan, J., concurring). For the last forty years, Fourth Amendment jurisprudence has focused primarily on the Katz test and its subjective/objective privacy dichotomy.
A method of older lineage, known as the intrusion or trespassory test,[3] focuses on whether government agents engaged in an “unauthorized physical penetration” into a constitutionally protected area. Silverman v. United States, 365 U.S. 505, 509, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); see also Olmstead v. United States, 277 U.S. 438, 466, 48 S.Ct. 564, 72 L.Ed. 944 (1928), overruled in part by Katz, 389 U.S. 347, 88 S.Ct. 507 (1967). In its 2011 Term, the United States Supreme Court reenergized the intrusion approach used in Silverman and earlier cases. In United States v. Jones, - U.S. -, -, 132 S.Ct. 945, 952, 181 L.Ed.2d 911 (2012), the Court held that placing an electronic tracking device on a suspect’s vehicle without consent was a trespass in violation of the Fourth Amendment. Id. at 949. In its holding, the Court explained that the “Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test.” Id. The Court further explained that the protections of the Fourth Amendment are implicated when the “Government physi *583 cally occupie[s] private property for the purpose of obtaining information” without permission to do so. Id.
The privacy approach and the intrusion approach converge when the focus of a governmental search is the home. It is axiomatic that people have an expectation of privacy in their homes that society recognizes as reasonable; indeed, this expectation exists even for overnight guests in a home. Minnesota v. Olson, 495 U.S. 91, 96-97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (defendant’s “status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable”). And by its text, the Fourth Amendment grants explicit protection to people to be secure in their houses so they may retreat therein and exclude others. See, e.g., Silverman, 365 U.S. at 511, 81 S.Ct. 679 (“At the very core” of the history of the Fourth Amendment “stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.”) (citing Entick v. Carrington, (1765) 95 Eng. Rep. 807 (K.B.); 19 How. St. Tr. 1029, 1066).
B.
Under the privacy and intrusion approaches, the home and its curtilage— the the area closely surrounding the home[4] — are constitutionally protected. Because it is appurtenant to the home, the curtilage is entitled to the same Fourth Amendment protection as the area within the home. See California v. Ciraolo, 476 U.S. 207, 212, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); see also Pinyan v. State, 523 So.2d 718, 720 (Fla. 1st DCA 1988) (“It is well settled that the Fourth Amendment protection of the home extends to the cur-tilage of a residence.”). This is so because the curtilage is “an area intimately linked to the home, both physically and psychologically,” thereby entitling it to protection from unreasonable searches. Ciraolo, 476 U.S. at 212-13, 106 S.Ct. 1809. Under the privacy approach, the Supreme Court has noted that “society accepts as reasonable citizens’ expectations of privacy in the area immediately surrounding their homes.” Ciraolo, 476 U.S. 207 at 221, 106 S.Ct. 1809, 90 L.Ed.2d 210. Under the intrusion approach, the constitutional protection of the curtilage pre-dates Katz, as mentioned in Olmstead. 277 U.S. at 466, 48 S.Ct. 564 (“an actual physical invasion of his house ‘or curtilage’ for the purpose of making a seizure” violates Fourth Amendment).
Simply because an area is deemed within the curtilage does not mean it is shielded from public or governmental view from a publicly-aceessible area.
That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer’s observations from a public vantage point where he has a right to be and which renders the activities clearly visible.
Ciraolo, 476 U.S. at 213, 106 S.Ct. 1809. Thus, police officers may use ordinary means from a public position outside the curtilage to view activities occurring within the curtilage, such as the viewing of marijuana plants with the naked eye in Ciraolo. Id. at 213-14, 106 S.Ct. 1809 (“Any member of the public flying in this airspace who glanced down could have *584 seen everything that these officers observed.”); see also Florida v. Riley, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (police officers’ “naked eye” observation into partially-covered greenhouse in home’s back yard from helicopter at 400 feet not a search requiring a warrant). Cf. State v. Barnes, 390 So.2d 1243, 1244 (Fla. 1st DCA 1980) (officer’s use of high-powered telescope to view marijuana in back yard “is an intrusion into an area in which there is a reasonable expectation of privacy, accomplished by special equipment not in general use”).
 Police “knock and talk” encounters at a home — where officers approach the front door — are permissible provided certain norms are met. Governmental actors, like private actors, have a limited license to approach a dwelling on a defined path, knock on the front door, briefly await an answer, and either engage in a consensual encounter with the resident or immediately depart. See, e.g., Nieminski v. State, 60 So.3d 521, 526 (Fla. 2d DCA 2011); Waldo v. State, 975 So.2d 542, 543 (Fla. 1st DCA 2008). A resident has the option to either open the door or refuse to do so. Kentucky v. King, - U.S. -, -, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011) (whether knock is by “police officer or a private citizen, the occupant has no obligation to open the door or to speak.”). “And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.” Id.; see also Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (“Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions.”).
The existence and extent of a license that would permit a “knock and talk” depends on the circumstances; homeowners who post “No Trespassing” or “No Soliciting” signs effectively negate a license to enter the posted property. See § 810.09, Fla. Stat. (Florida’s trespass statute). Where no signs forbid entry, and there is a recognizable pathway to a front door, a limited license to enter the property on the pathway and knock on the door exists. Nieminski, 60 So.3d at 526-27. Where such a license is established, the resident does not have a reasonable expectation of privacy in what is plainly viewed from the vantage point of a temporary visitor who walks along the pathway or stands at the doorway. See State v. Morsman, 394 So.2d 408, 408-09 (Fla.1981) (discussing legality of seizure of contraband within plain view of where an officer has a right to be, such as a “front porch where salesmen or visitors may appear at any time”); State v. Kennedy, 953 So.2d 655, 656-57 (Fla. 1st DCA 2007) (collecting cases).
It is a different matter when police officers choose to physically enter other portions of a home’s curtilage — areas where they have no right to be. See, e.g., Olivera v. State, 315 So.2d 487, 488 (Fla. 2d DCA 1975) (leaving walkway and crossing grass to stand next to a window to listen to conversation inside was unreasonable). Even when governmental agents are engaging in otherwise lawful “knock- and-talks,” they can exceed the scope of a reasonable visit to a front door or porch through physical actions that encroach into areas in which the resident has a reasonable expectation of privacy. State v. Adams, 378 So.2d 72, 74 (Fla. 3d DCA 1979) (standing on a chair on front porch to look down from a window into apartment was unreasonable). Cf. State v. Leonard, 764 So.2d 663, 664 (Fla. 1st DCA *585 2000) (stretching to full height and standing on tiptoes on doorsill was reasonable).
C.
Turning to the case at hand, we focus only on whether the officers peering into the window violated the Fourth Amendment. In doing so, we need not pass upon the constitutionality of the officers’ entry into the back yard, which bore no evidence used against Powell or Wilbourn.[5]
We begin with the burden of proof. Because the officers lacked a warrant at the time they looked in the window, the burden rested with the State to justify an exception to the warrant requirement. Hilton v. State, 961 So.2d 284, 296 (Fla.2007) (“When a search or seizure is conducted without a warrant, the government bears the burden of demonstrating that the search or seizure was reasonable.”); Kilburn v. State, 54 So.3d 625, 627 (Fla. 1st DCA 2011) (“A warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-defined exceptions.... The State has the burden to prove that an exception to the warrant requirement applies.”) (citation omitted).
To meet its burden, the State presented the testimony of two officers along with the search warrant. Because the trial court made no written findings of fact, “we view the evidence and all reasonable inferences from it in the light most favorable to sustaining the order.” State v. DeLuca, 40 So.3d 120, 123 (Fla. 1st DCA 2010). Of course, “a suppression order that turns on an issue of law is reviewed by the de novo standard of review.” Ikner v. State, 756 So.2d 1116, 1118 (Fla. 1st DCA 2000).
Here, our task is made easy because there are no disputed facts: the officers candidly explained what they did and why they did it. No dispute exists that the officers were within the curtilage of the home when they peered into the window; the officers conceded as much in their testimony. To our knowledge, no court has held that an area within arm’s length of a home’s window is anything other than within the curtilage.
The question then becomes whether the officers looking into the window violated either the privacy or intrusion tests. We apply the latter first, it being the more straightforward. Under the intrusion approach, we query whether the police officers physically “occupied private property for the purpose of obtaining information” without express or implied permission to do so, thereby intruding into an area protected by the Fourth Amendment. Jones, 132 S.Ct. at 949. Here, the deputies initially followed established norms: they approached the front door via the pathway, took one step up, and knocked. Receiving no response, a private citizen would have had no choice but to depart immediately via the pathway. Indeed, Deputy Tysall acknowledged that if someone inside the home had told the officers to go away, they would have done so after asking if the occupants were okay.
The deputies, however, deviated from established norms by entering upon that portion of the property directly in front of the window. Nothing in their testimony or the record establishes any license to do that. The officers had to step off the front door step, move two feet to the left, and position themselves directly in front of the window, their faces no more than a foot *586 away. At that point they were virtually within the home without breaking its close. Because they physically entered a part of the curtilage where they had no right to be for the purpose of gaining information, the intrusion test is met.
Similarly, the State’s evidence lacked any indicia that the privacy of the mobile home’s kitchen area had been diminished by its occupants. No evidence exists that Powell or Wilbourn knowingly exposed the interior of their home where the plants were located to the public view or impliedly licensed the general public to peer in their front window from a foot away. No evidence was presented that the kitchen area (where the plants were located) could be seen from the public roadway, from the pathway leading to the front door, or from the front door itself. Instead, the plants could only be seen from outside the home by stepping away from the front door, placing officers within a hand’s width of the window pane, casting their view rightward at an acute angle. As in Olivera, Powell and Wilbourn “could reasonably expect that no one would observe or overhear [their] activities” from just outside their window. 315 So.2d at 491. We agree with the Second District that “the implications of sanctioning police surveillance by standing in a yard at one’s window in the middle of the night' are too obvious to require elaboration.” Id. (footnote omitted). Because nothing negates the subjectively and objectively reasonable expectation of privacy within the kitchen area of the mobile home (or at the front widow itself), the privacy test is met.
The State argues that no expectation of privacy exists on a “front porch” and that the officers “had to simply step off the porch a few feet from the front door where the window was at eye level” to be able to look into the home. We agree that no expectation of privacy exists on a front porch exposed to the public and impliedly open to view, including (as is the case here) the single step up to the front door (there being no “porch” in the common meaning of the word). We cannot agree, however, that stepping off a porch, even a few feet, onto portions of the curtilage where persons are uninvited and then looking into the home at a sharp angle from a hand’s length away from the window pane is anything other than an impermissible intrusion into constitutionally protected space. Whether two feet or twenty, the distance between the door and window matters little given that the officers said they could not see the plants without leaving the front door step and positioning themselves at a spot where they had no right to be. See also Morsman, 394 So.2d at 408 (plain view doctrine “applies only when the officer has a legal right to be at his viewpoint”).
At oral argument, the State urged that we consider the window to be “closely associated” with the front door of the mobile home and thereby hold that it is entitled to no more protection than a window in the door itself through which any visitor could see. This argument was not raised below, nor in the State’s appellate brief, so we need not consider it. Even so, no evidence was presented at the suppression hearing that the window was “closely associated” with the door. The State presented no pictures of the door, window, or the mobile home itself. In addition, the testimony established that it was necessary to get off the front door step and move over to the window to see inside; and that it was necessary to be within less than a foot of the window looking sharply to the right to see into the kitchen area where the plants were located. Under these circumstances, the window cannot be considered to be “closely associated” with the mobile home’s front door.
*587 That said, we can envision front door configurations that have windows incorporated directly into their designs through which a visitor might be able to see the interior using no unusual means or devices. This case simply does not involve such a situation. Under certain circumstances, implicit permission may exist to look through an un-curtained window while standing on a front porch momentarily to see whether the resident is approaching the door, assuming no unreasonable means or devices are used. Cf. State v. Rose, 128 Wash.2d 388, 909 P.2d 280, 283 (1996) (while standing on front porch, officer looked through window with flashlight into home). No similar permission exists, however, to step away from a front door or deviate from a walkway or path to look into windows or enter other protected areas around the home simply because a knock on the front door goes unanswered. See Morsman, 394 So.2d at 408 (entering back yard after no answer at front door an unlawful search); Lollie, 14 So.3d at 1079 (constitutional protection of side and backyard areas of home “does not depend on whether someone might be home”); Waldo, 975 So.2d at 543 (entry into side and back yards unlawful after “nobody answered” knock on front door); Olivera, 315 So.2d at 488 (leaving sidewalk, walking across grass to window, and listening to conversations an unlawful search); see also U.S. v. Fuentes, 800 F.Supp.2d 1144 (D.Or.2011) (entering curtilage and standing “within inches of a window” to peer into home as way to contact occupant unlawful).
To the extent exigent circumstances might warrant a different conclusion, the State makes no argument that any existed. Moreover, that the “knock and talk” was prompted by a call from an anonymous tipster makes it all that more important that officers act with circumspection. For example, the tip in Morsman “was received from a neighbor who had heard it from another neighbor.” 394 So.2d at 409.
Dependability of such second-hand hearsay is dubious. When hearsay makes up the basis of a complaint, the warrant clause requires that the evidence be presented to a detached magistrate to decide if the hearsay information gives probable cause to conduct a search. If it does, the magistrate may then issue a search warrant.... Under this procedure, a person is protected from an unreasonable search in violation of his Fourth Amendment rights.
Id. Here, as in Morsman, it is “impossible to tell from the record before us whether the information conveyed to the police ... was in any way worthy of belief at the time it was conveyed. It is exactly this type of situation which mandates the protection of the Fourth Amendment.” Id. That the anonymous tip proved accurate, and that the officers acted with good intentions, does not alter the legal conclusion that the search was improper. See Florida v. J.L., 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (“The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.”).
In concluding the search was unlawful, we do not suggest in any way that officers should ignore information or be less vigilant in pursuing the law enforcement priorities of their communities; prompt action by officers is highly commendable. But the end result must conform with constitutional principles. Based on the foregoing, we hold that under either the expectation of privacy approach or the intrusion approach, the officers’ intrusion into a constitutionally protected area without a warrant and peering into a window constituted an unconstitutional search.
*588 III.
Since oral argument in this case, the United States Supreme Court issued its decision in Florida v. Jardines, - U.S. -, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013), which bolsters our holding in this case. In Jardines, after receiving a tip that the defendant was growing marijuana in his home, an officer approached the defendant’s front porch accompanied by a drug-detection dog. Id. at 1413. The dog, after sniffing at the base of the front door, alerted for the presence of marijuana. Id. Officers used this information to obtain a search warrant, and upon execution of the warrant seized marijuana plants inside the home. Id.
Justice Scalia, writing for the Court, affirmed our supreme court’s conclusion that police officers intruded upon the curti-lage of the home by bringing a dog that could detect the smell of contraband emanating from within. Applying the intrusion analysis reenergized by Jones, the Court held that once it is established that officers are in a constitutionally protected area, “the only question is whether [the homeowner] had given his leave (even implicitly)” for them to be there. Id. at 1415. In concluding they had not, Justice Scalia pointed out that a knocker on the front door is an “implicit license” that “typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.” Id. A “police officer not armed with a warrant may approach a home and knock, precisely because that is ‘no more than any private citizen might do.’ ” Id. (citing Kentucky v. King, - U.S. -, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011)). Jardines confirms that officers can do “knock-and-talks,” but it provides no support for the notion that they can step off the front steps and enter other portions of the curti-lage to engage in a search without demonstrating an exception to the constitution’s requirement of a warrant.
Moreover, going beyond the accepted social norm of approach/knoek/leave-if-no-answer exceeds the implied license that a door knocker or pathway to the front door may invite. One way the license can be exceeded is where officers enter the curti-lage, bringing along detection devices used to conduct a search. As the Court held, “[a]n invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker.” Id. at 1416. Pertinent to this case, the Court noted: “To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to — well, call the police.” Id.
Another way the license can be exceeded is where the purpose for which the license exists is violated. For example, a license may allow entry to a designated physical area, such as the front door or porch, but for only specific purposes. As the Court noted, “[c]onsent at a traffic stop to an officer’s checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.” Id.
Jardines has two significant takeaways. First, it punctuates that “when it comes to the Fourth Amendment, the home is first among equals” and that the constitutional protection of the curtilage springs from “ancient and durable roots.” Id. at 1414. Thus, “an officer’s leave to gather information is sharply circumscribed when he steps off [public] thoroughfares and enters *589 the Fourth Amendment’s protected areas.” Id. at 1415. Of importance here, Justice Scalia said the right to retreat into the home to be free from unreasonable governmental intrusion “would be of little practical value if the State’s agents could stand in a home’s porch or side garden and trawl for evidence with impunity; the right to retreat would he significantly diminished if the 'police could enter a man’s property to observe his repose from just outside the front window.” Id. at 1414 (emphasis added). Like our analysis here, Justice Scalia focused on the fact that police “gathered ... information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.” Id. at 1414.
Second, courts need not labor under the Katz privacy approach when the two-step intrusion approach establishes a violation. As Justice Scalia noted:
we need not decide whether the officers’ investigation of Jardines’ home violated his expectation of privacy under Katz. One virtue of the Fourth Amendment’s property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines’ property to gather evidence is enough to establish that a search occurred.
Id. at 1417. Cases involving warrantless searches of the home or curtilage may be somewhat easier to analyze under the intrusion approach because the property interests are generally better defined. The lack of a physical intrusion, of course, does not end the story in many Fourth Amendment cases, making the Katz privacy test the primary means of analysis. As the Supreme Court emphasized in Jones, and now in Jardines, the two tests complement one another; the courts of this state must consider both approaches in conformity with these precedents. See Art. I, § 12, Fla. Const, (state constitutional rights against unreasonable searches and seizures “shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court”).
IV.
In summary, we conclude that the officers’ intrusion into the curtilage of the mobile home, on a part of the property on which they had no legal right to be, and peering through a window a hand’s length away at a sharp angle into an otherwise private part of the home, constituted a search in violation of the Fourth Amendment under both the expectation of privacy test and the intrusion test. Either'way, this entry into the protected private space of the home was an improper attempt to verify an anonymous tip. Morsman, 394 So.2d at 410 (“The shortcut taken by skipping the application for a warrant was unjustified and violated defendant’s Fourth Amendment right to be free from an unreasonable search and seizure.”). Under the exclusionary rule, we are compelled to reverse the convictions, which were based entirely on evidence obtained due to the unlawful search. Art. I, § 12, Fla. Const. (“Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.”); see also Wong Sun v. United States, 371 U.S. 471, 484-85, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (evidence obtained by Fourth Amendment violation excluded as “fruit of the poisonous tree”). As the State has stipulated that the motions to suppress are disposi-tive, we REVERSE.
*590 LEWIS, J., concurs.
THOMAS, J., concurs in result only.

. Its estimated 2010 population was 8,870. See U.S. Census Bureau, 2010 Census of the United States, State and County Quick Facts, http://quickfacts.census.gov/qfd/states/12000. html (visited April 1, 2013).

. See Big Bend, Wikipedia ("Perhaps the most culturally relevant definition of the Big Bend region is the section of west peninsular Florida's coast without barrier islands — the section from Anclote Key (or the Anclote River), near Tarpon Springs to Ochlockonee Bay, near Alligator Point.”), http://en.wikipedia.org/wiki/ Big_Bend_(Florida) (last visited April 1, 2013).

. Debate exists on whether the older Supreme Court decisions used a true “trespassory” approach versus an "intrusion” approach. See Orin Kerr, The Curious History of Fourth Amendment Searches, 2012 Sup.Ct. Rev. (forthcoming 2013). We use the phrase "intrusion” because it appears to more accurately describe the Supreme Court's analytical approach.

. See State v. Hamilton, 660 So.2d 1038, 1042 (Fla.1995) (discussing common law and contemporary meanings of what constitutes the curtilage).

. Had entry into the backyard yielded incriminating evidence, caselaw with nearly identical facts would require reversal. See State v. Morsman, 394 So.2d 408 (Fla.1981); Lollie v. State, 14 So.3d 1078 (Fla. 1st DCA 2009); Waldo v. State, 975 So.2d 542 (Fla. 1st DCA 2008).