# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D22-2108
LT Case No. 2020-CF-002718-A

_____

SCOTT RUDOLPH,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Lake County.
Heidi Davis, Judge.

Matthew J. Metz, Public Defender, and Allison A. Havens,
Assistant Public Defender, Daytona Beach, for Appellant.

Ashley Moody, Attorney General, Tallahassee, and Pamela J.
Koller, Assistant Attorney General, Daytona Beach, for Appellee.

April 12, 2024

MAKAR, J.

    The constitutional "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures" was adopted to protect against the types of governmental abuses of power that allowed people, their homes, and their property to be subject to warrantless intrusions and

confiscations in Britain and its colonies. As the Supreme Court has repeatedly reminded us, this revered Fourth Amendment right is first and foremost a protection of the home, a safe-guarded private space for which a judicial warrant is necessary before government can invade the premises. *Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("But when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (citation omitted)). Non-judicial intrusions into the home, such as a warrantless entry by law enforcement, are impermissible with limited exceptions.

With this backdrop, the issue in this case involves the warrantless intrusion into the home of Scott Rudolph, who challenges the trial court's denial of his motion to suppress, in which he argued that sheriff's officers violated his federal and state constitutional rights when they used a flashlight to peer through the opaque black vinyl wrapping that encased and made private the enclosed front porch of his home. Because the officers exceeded what is permissible for a "knock and talk" visit, entered Rudolph's home without a warrant, lacked reasonable suspicion or probable cause for the search or entry, and had no exigent circumstances, the trial court erred in denying his motion to suppress.

I.

Like much of Florida, Lake County is home to senior (55+) retirement parks where people live year-round or visit during the winter months. The county has become a retirement destination, best exemplified by The Villages® to its northwest, a sprawling retirement community (including into Lake County) which was the "fastest growing U.S. metro area between 2021 and 2022, increasing [in population] by 7.5%."* One of the county's senior retirement parks is Holiday RV Village, a 200+ acre campus with

---

\* *Large Southern Cities Lead Nation in Population Growth*, U.S. Dep't of Commerce, (May 18, 2023), https://www.census.gov/newsroom/press-releases/2023/subcounty-metro-micro-estimates.html.

hundreds of recreational vehicle hookups and hundreds of homes on small lots, making the community densely packed.

In October 2020, tragedy befell a husband and wife residing in one of those homes. Around 9:00 pm, the wife heard a knock on their front door followed by a gunshot. She found her husband near the front door with a fatal wound to his head and broken glass strewn on the front steps. Officers were soon on the scene, going door to door to canvass nearby homes and seek witnesses to what happened.

Two of the officers, working as a team, knocked on three or four doors in the neighborhood but found no eyewitnesses. They returned to the victim's home where the supervising officer told them to go to Rudolph's home, which was next door. At that time, neither officer knew who resided at the home, nor did they have reason to believe that its owner was a suspect or that probable cause existed to conduct a warrantless search; instead, it was simply another attempt to see if a neighbor had seen or heard anything.

Rudolph's home was "really dark," suggesting no one was home. The officers approached and knocked on the front door of the enclosed porch, which was physically attached to the residence, announcing their presence as law enforcement officers. From the front doorstep, the officers were unable to see anything inside the enclosed porch because the porch screens were covered with a reflective opaque black vinyl that encased the entire room, acting as a protective barrier against sunlight and the elements. *See* Appendix. The front door had a welcome mat and a doorbell, which the officers did not attempt to ring, testifying they did not see it. The front door had a visible external lock but was unlocked at the time of the incident.

After receiving no response, the officers knocked a second time. Again, no one answered. At that point, one of the officers decided to use a flashlight to attempt to look inside. It was impossible to see into the enclosed space without the flashlight ("Q: In fact, you couldn't see inside of this room without your flashlight? A: Correct."). The flashlight enabled the officer to see into the interior, which was furnished with two dining tables, a side table,

upholstered lounge chairs and dining chairs, a television, vertical blinds, lamps, fans, a bookcase, and various personal belongings (e.g., shoes); the room had carpeting, electricity, and air conditioning. *See* Appendix.

Assisted by the flashlight, the officer saw a rifle propped up against one of the tables; she also saw that a sliding glass door leading deeper into the residence was open. After back-up was called, one of the officers opened the front door, entered the interior, and announced her presence. Once inside, she went through the sliding glass door into the next room where she saw Rudolph sitting in a chair with a handgun on the floor. Rudolph did not resist and was handcuffed and secured in a patrol car without incident. He was later charged with the first-degree murder of his neighbor and ultimately entered a plea subject to appellate review of his motion to suppress.

II.

The first constitutional question is whether Rudolph's enclosed porch—encased with opaque black vinyl and furnished and used like an interior room—is a constitutionally protected area of the home for which a warrant (or warrant exception) is required to enter. We find that it is.

The Fourth Amendment's protection against unreasonable searches and seizures includes a home and its curtilage—the area "immediately surrounding and associated with the home . . . [which is regarded to be] part of the home itself for Fourth Amendment purposes." *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The Supreme Court has identified four factors that relate to curtilage:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301 (1987). Under these guideposts, a "property's front porch and door area generally fall

4

within the constitutionally protected curtilage of the home." *State v. Crowley*, 232 So. 3d 473, 475 (Fla. 1st DCA 2017); *see generally* Wayne A. Logan, *Florida Search & Seizure*, § 4.30, Particular Applications: Porches at 4-8 (2002 Ed.) ("Under the *Dunn* multi-factor test, the porch of a single-family home would appear clearly within a home's curtilage."). Consistent with *Dunn*, courts consider steps taken to enclose and make an area private, such as adding physical or visual barriers that reflect an owner's subjective expectation of privacy. *See Nieminski v. State*, 60 So. 3d 521, 524 (Fla. 2d DCA 2011). Putting up fences, or as in this case putting up a visually impenetrable vinyl barrier and an external lock, are affirmative steps to exclude the public and others from peering into or gaining access to the space. *Bainter v. State*, 135 So. 3d 517, 520 (Fla. 5th DCA 2014).

A front porch permanently attached to a home—whether enclosed or open air—is normally within the home's curtilage. Indeed, each of the *Dunn* factors are present, demonstrating that Rudolph's *enclosed* porch is a constitutionally protected area. It was a permanent part of his residence and was entirely covered with an opaque black vinyl that made it impossible to see into the room with the naked eye. The porch was furnished as if an interior room, with multiple tables and chairs, a television, and personal belongings; it had electricity, air conditioning, fans, and other items indicative of a home's interior. The porch door had a doorbell, a welcome mat, and a lock, serving as the front door to the home. These details collectively make clear that Rudolph's enclosed and visually impenetrable porch was a private space, like the other interior portions of the home in which Rudolph had a reasonable expectation of privacy; it is objectively reasonable in a state that has popularized the concept of "Florida Rooms," i.e., enclosed sunrooms, which are ubiquitous and oftentimes made private by the use of blinds, shades, and, in this case, an opaque black vinyl covering. *See Bainter*, 135 So. 3d at 520 (stating that the judicial inquiry "is whether the defendant exhibited an actual, subjective expectation of privacy that society is prepared to recognize as reasonable").

The second constitutional question is whether the use of a flashlight to look inside the enclosed porch, after no one responded

to the officers' knocks, was an impermissible intrusion under the circumstances. We find that it was.

There is an implied license for law enforcement to approach a home's front door to conduct a "knock and talk" without needing reasonable suspicion or probable cause to do so. *Jardines*, 569 U.S. at 8 ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."). A "knock and talk" is "only justified as a consensual encounter during which officers are authorized to 'approach a dwelling on a defined path, knock on the front door, briefly await an answer, and either engage in a consensual encounter with the resident or immediately depart.'" *Calloway v. State*, 118 So. 3d 277, 279 (Fla. 5th DCA 2013) (citations omitted).

As a general matter, anything that can plainly be seen with the naked eye from a lawful vantage point is not recognized as private or deserving of constitutional protection. *Powell v. State*, 120 So. 3d 577, 584 (Fla. 1st DCA 2013) ("[T]he resident does not have a reasonable expectation of privacy in what is plainly viewed from the vantage point of a temporary visitor who walks along the pathway or stands at the doorway."). "However, knock-and-talk activity by law enforcement that diverts from the customary path to a home's front door, or that exceeds other objectively reasonable bounds, can present Fourth Amendment problems requiring the suppression of evidence." *Crowley*, 232 So. 3d at 476. For example, police officers may approach a home and its curtilage to do a "knock and talk" but not with a drug-sniffing canine. *Jardines*, 569 U.S. at 9 ("An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker."). Likewise, the implied and limited license to approach a home's front entryway and curtilage is not an invitation to reveal and explore its otherwise private interior with a flashlight. It's one thing to have a visitor knock on the front door; it's quite another for that same visitor to use invasive means to invade the privacy of the interior. *Id.* ("To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector or marching his bloodhound into the garden before saying hello and asking permission, would

inspire most of us to—well, call the police.").

Here, the officers' testimony makes clear that the rifle inside the enclosed porch was *not* plainly viewed from the front step; indeed, it could not be seen at all because the impenetrable vinyl porch screen made it impossible to see what was inside without external illumination. *Cf. Koehler v. State*, 444 So. 2d 1032, 1033 (Fla. 1st DCA 1984) (no expectation of privacy on unenclosed front porch which was exposed to public view); *State v. Detlefson*, 335 So. 2d 371, 372 (Fla. 1st DCA 1976) (no reasonable expectation of privacy on front porch of home where delivery men and others could observe the plants). It was only when a flashlight was used to peer into the private space that the rifle and the open sliding glass door into the next room were seen. Because the rifle was not plainly viewed from the officers' vantage point outside of the enclosed porch, the officers' use of a flashlight to look past the screen constituted an unlawful intrusion into a constitutionally protected area. Police officers are often called upon to use flashlights in nighttime situations, such as illuminating a public pathway, structure or space, which is permissible; what occurred here, however, was quite different—the flashlight was being used to peer into an otherwise impenetrable private space.

As the First District explained in *Powell*, "[u]nder certain circumstances, implicit permission may exist to look through an *un-curtained* window while standing *on* a front porch momentarily to see whether the resident is approaching the door, *assuming no unreasonable means or devices are used*." 120 So. 3d at 587 (emphasis added). Here, no un-curtained window existed; instead, the officer used a flashlight to break the close, allowing her to peer into a private space. The officers, as they both testified, knocked on Rudolph's porch door solely to find witnesses. When Rudolph didn't answer the door, the officers' license to engage in a "knock and talk" ended; it was thereby improper to linger and use a flashlight to peer inside in a manner no different than peering through a keyhole. *See Jardines*, 569 U.S. at 9 (noting that officers cannot position themselves at a home's doorstep and "peer into the house through binoculars with impunity. That is not the law, as even the State concedes."); *see also Commonwealth v. Murray*, 223 A.2d 102, 110 (Pa. 1966) (stating that "if detectives and private intermeddlers may, without legal responsibility, peer through

7

keyholes, eavesdrop at the table, listen at the transom and over the telephone, and crawl under the bed, then all constitutional guarantees become [a] meaningless aggregation of words, as disconnected as a broken necklace whose beads have scattered on the floor").

One of the officers explained that it was common practice in the jurisdiction to enter private spaces, such as enclosed porches with beds, furniture, blinds, and other indicia of privacy, when no one answers their knocks; in these situations, they enter the space and attempt to locate and knock on another door. This practice is impermissible. As Justice Scalia noted in *Jardines*, officers "may only approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." 569 U.S. at 8. It is well-established that officers may not "look into windows or enter other protected areas around the home simply because a knock on the front door goes unanswered." *Id.*; *see State v. Morsman*, 394 So. 2d 408, 408–09 (Fla. 1981) (concluding that entering backyard after no answer at front door was an unlawful search); *Lollie v. State*, 14 So. 3d 1078, 1079 (Fla. 1st DCA 2009) (finding that constitutional protection of side and backyard areas of home "does not depend on whether someone might be home"); *Waldo v. State*, 975 So. 2d 542, 543 (Fla. 1st DCA 2008) (holding that entry into side and backyards was unlawful after "nobody answered" knock on front door); *see also United States v. Fuentes*, 800 F. Supp. 2d 1144, 1154 (D. Or. 2011) (concluding that entering curtilage and standing "within inches of a window" to peer into the home as way to contact an occupant was unlawful). As such, the practice of entering private enclosed porches after initial knocks go unanswered to search for another door within the home upon which to knock is insupportable. *See Jardines*, 569 U.S. at 9 n.4 ("[N]o one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.").

Finally, no exigent circumstances or other warrant exception existed that would justify the use of a flashlight to peer into the enclosed porch and enter the home after no one responded to the officers' knocks. The officers had no suspicion that an occupant was a suspect or that probable cause to enter and search the home existed ("Q: So at the time you chose to enter [Rudolph's] home,

there was no suspicion that he was a suspect and there certainly was no probable cause that he was a suspect? A: Correct."). No hot or fresh pursuit was afoot; no emergency aid to occupants was necessary nor was destruction of evidence taking place. The officers were simply looking for possible witnesses, which is not an exigent circumstance that makes resort to the warrant process impractical. *See Davis v. State*, 834 So. 2d 322, 327 (Fla. 5th DCA 2003) ("The sine qua non of the exigent circumstances exception is 'a compelling need for official action and no time to secure a warrant.'" (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978))); *Herring v. State*, 168 So. 3d 240, 244 (Fla. 1st DCA 2015) ("[I]f time to get a warrant exists, the enforcement agency must use that time to obtain the warrant." (quoting *Hornblower v. State*, 351 So. 2d 716, 718 (Fla. 1977))). That the officers obtained a warrant soon thereafter demonstrates this point.

For the foregoing reasons, we agree that an unconstitutional search and seizure occurred and that the trial court erred in denying the motion to suppress. The officers had no authority, after their knocks went unanswered, to use a flashlight or other device to peer into a home's enclosed porch that was heavily masked with impenetrable black vinyl, furnished as an interior, and designed to protect the owner's reasonable privacy interest. We do not address or opine on whether it was inevitable that the weapon in Rudolph's home would have been discovered or the extent to which evidence or statements would be subject to suppression, only that the manner by which the weapon was initially discovered was impermissible.

REVERSE and REMAND for further proceedings.

WALLIS, J., concurs.
MACIVER, J., concurs specially, with opinion.

9

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

Case No. 5D2022-2108
LT Case No. 2020-CF-002718-A

MacIver, J., concurring specially, with opinion.

I concur with the majority's holding in this case because we are bound by the precedent of *Florida v. Jardines*, 569 U.S. 1 (2013). Because I am critical of that decision for the reasons stated in the dissent by Justice Alito, I am equally critical of our holding here. Simply put, I believe that the reasonableness of an officer's intrusion onto the curtilage of private property needs to be moored to something more than the courts' determination of the property owner's subjective intent in granting an implicit license. If a private person's activity would not violate some positive prohibition (i.e., trespass) then the same activity by a law enforcement officer should not be deemed an unreasonable search. My view, though, would admittedly be a reversion to Fourth Amendment jurisprudence before *Jardines*; I therefore reluctantly concur.

10

APPENDIX



